Alexander Berman, J.
The petitioners herein, who are professors at Nassau Community College, seek (judgment in this article 78 proceeding, preventing the County Executive and other officers of the County of Nassau from removing them from the homes which they occupy on campus and/or from charging a rental for said dwellings.
The petitioners are all occupants of houses on campus of Nassau Community College and have been, for varying periods of time during the past five or more years. They pay a small monthly charge for certain services and each is required to maintain his house and grounds in good condition. They have now been advised by the college president that the free rent policy has been discontinued and that a monthly rental charge would be made to each of the petitioners in the amount of $250 per month, and they have been furnished with proposed lease agreements to be executed by them. This change in policy was prompted initially by the State and county auditors, who questioned the legality of the free rent arrangement.
The arrangement for campus housing was initially set forth in a declaration or resolution by the Board of Trustees of the Nassau Community College dated October 9, 1963 entitled “ Campus Housing — General Policy ”, which, inter alia, stated that the presence on campus of department heads and certain other professors was essential to the proper functioning of their duties at the college, and that “ Once assigned a house, the occupant may remain in the house so long as he continues to hold his position in the College, maintains the house and grounds in *325 good condition and so long as he conducts himself in a manner expected of a faculty member.”
In support of their position that they may not be removed or charged rent, the petitioners refer to the quitclaim deed wherein the United States of America conveyed the premises on which these houses are situated (formerly part of Mitchell Air Force Base) to the County of Nassau “ for the uses and purposes of the Nassau Community College ”, which instrument further provides: (a) that for a period of 20 years the premises “ shall be utilized solely and continuously by the Nassau Community College for educational purposes ”; and (b) that all revenues which are received by the County of Nassau “ directly or indirectly from any sale, lease,” etc., “ shall be considered to have been received and held in trust by the party of the second part [the County of Nassau] and shall be held subject to the direction and control of the Department of Health, Education and Welfare.”
Petitioners contend that it was the expressed intention of the United States, in making this conveyance of the former Mitchell Air Field property, that no rent be collected for these housing units, and that, furthermore, the collection of any rent would be contrary to the terms of the deed of conveyance. They conclude, therefore, that the county is thereby precluded from charging any rent.
It is their further contention that the county is bound by the aforesaid “ Campus Housing— General Policy ” declaration of the Board of Trustees of the Community College, at the same time conceding, however, that the Board of Supervisors of the County of Nassau never enacted a confirmatory ordinance to implement such housing policy.
They argue that the County of Nassau is, in any event, now estopped from altering that policy, because these professors acted in reliance thereon, and that they had changed their positions by giving up their own former homes or that they made certain minor improvements and/or purchased furniture especially suitable for these homes. Furthermore, they assert that, even though the County of Nassau did not officially adopt an. ordinance or enter into any written agreement with them, the County Attorney, then in office, in an interdepartmental memorandum dated September 30,1963, to the Chairman of the Board of Trustees of Nassau Community College stated, in substance that the housing policy resolution of the college board which had been adopted subject to his approval was then approved by him.
*326 The respondents on the other hand take the position (a) that the Board of Trustees of the Community College acted beyond its authority and without the sanction or approval of the county in the so-called housing resolution; (b) that the only manner in which the county may act in granting any rights of this nature is limited by the County Charter and law to enactment of a duly adopted ordinance, which was never done; (c) that there was no estoppel as far as the county is concerned; and (d) that the collection of rent from these professors would in no way jeopardize the county’s continued ownership of the property, nor was it in violation of the terms of the instrument of conveyance.
Nassau Community College was established and operates pursuant to article 126 of the Education Law of the State of New York. It is financed partly by State aid and partly by county funds. The college is administered by a Board of Trustees, whose powers and duties are set forth in section 6306 of the Education Law. These are sharply delineated and relate primarily to the curricula and the operation of the college and provide as to its other functions that (subd. 7) “ the board of trustees of each community college may enter into any contract or agreement deemed necessary or appropriate for the executive operation of the college ”. This provision, however, is prefaced with the following language: “ Subject to the approval of the local sponsor acting through its local legislative body or board ” (Education Law, § 6306, subd. 7). In referring to the respective powers of the college board and its local sponsor, a county board, in a somewhat analogous situation, the Appellate Division held, in discussing the limits of the powers of the college trustees:
“ From the provisions of article 126 of the Education Law, whereby community colleges are authorized to be established, it is evident that the board of -trustees is of strictly limited authority; and that from the moment of organization the county board, which must appoint five of the nine members of the college board (§ 6306, subd. 1), is the dominant member of the partnership. The college board is charged (subject in most cases to the regulations of the State University Trustees) with supervision of the academic functions of the college, including internal administration, in some areas by mandatory delegation of power to the president of the college; is charged, also, with the adoption of curricula and the preparation of budgets, subject, however, to the approval of the State University Trustees in one case and to that of the local legislative body of the sponsor in the other; and, additionally, is charged with the care and management of the lands, grounds, buildings, facilities, equip *327 ment and other property used for purposes of the institution. (See, e.g., § 6301, subd. 2; § 6306, subds. 2, 5.)
“It is equally, and abundantly clear from an over-all consideration of the various pertinent provisions of .article 126 that the county, the local sponsor, is given, and required to exercise firm and close control of the financial structure of the college and its fiscal operations, as respects both capital and income transactions. * * *
“ Examining further into thé statutory scheme, we note that the county board’s all-pervasive and inclusive control in matters of capital and of capital finance, as indeed of income, is repeatedly indicated in the provisions of article 126; as in that directing preparation of the budget by the college board ‘ for submission to and approval by ’ the Board of Supervisors (§ 6306, subd. 2; emphasis supplied); in the provision that contracts or agreements ‘ deemed necessary or appropriate for the effective operation of the college ’ may be entered into by the board of trustees, subject to the approval of the sponsor and to regulations and limitations by the State University Trustees (§ 6306, subd. 7); in the direction that financial assistance granted to the college by the State shall be paid to the sponsor (§ 6302, subd. 3); in the authority granted to the county board with respect to the issuance of bonds and notes (§ 6304, subd. 1, par. b); and in the provisions for close control by the county board of all financial transactions, by audit, regulation and various other means, extending even to petty cash funds of not to exceed $200. each (§ 6304, subds. 5, 6; § 6302, subd. 3).” (Meyer v. Wiess, 25 A D 2d 174, 176-177.) (Italics supplied.)
It is apparent that the Board of Trustees of the community college in this area was without authority to bind the County of Nassau by any act on its part, absent ratification or formal approval. The Board of Supervisors of the County of Nassau is governed by the County Government Law of Nassau County, which provides (L. 1936, ch. 879, § 105, subd. 1): “ The board of supervisors shall act only by ordinance or resolution. No money shall be appropriated, bond issue or other loan authorized, assessment levied, office created, salary fixed, franchise or privilege granted, real property of the county alienated, fine or penalty established, except by ordinance.”
The contention of the petitioners that the then County Attorney approved the housing policy above referred to is of no avail. The County Attorney’s authority is clearly limited (Nassau County Government Law, § 1102). No act on his part can bind the Board of Supervisors unless he is acting pursuant to unequivocal authority granted to him by a duly adopted ordi *328 nance. He obviously has no power or authority to ratify the act of the Board of Trustees of the Community College. “ The ratification must be by the officer or body originally empowered to make the contract, and in the case of executory contracts in the mode and form required by law in the first instance, since ratification is equivalent to previous authorization and operates upon the act ratified in the same manner as though authority had been given originally. In other words, where contracts of a municipality are required to be made in a specified manner, and where an express contract is necessary, an invalid contract can be ratified only by an observance of the. same formalities and provisions necessary to be complied with in the making of a valid contract. It follows that where authority to do the act can only be conferred by ordinance the ratification of an executory contract can.only be by ordinance.” (10 McQuillin, Municipal Corporations, § 29.106, p. 527.)
Also, “ Within the practical application of that rule, such a contract must be within the scope of the corporate powers and must not be one which the charter or law governing the corporation requires should be made in a particular way or manner. (Dillon on Municipal Corp. §§ 383, 384, and cases cited in note; 2 Kent’s Com. 291; Bank of Columbia v. Patterson, 7 Cranch. 299; Peterson v. Mayor, etc. 17 N. Y. 449; Harlem Gas Light Co. v. Mayor, etc. 3 Robt. 124; affd. 33 N. Y. 309; Nelson v. Mayor, etc. 63 N. Y. 535; McCloskey v. Mayor, etc. 7 Hun 472.)
“ When the act done is ultra vires, it is void and there can be no ratification, and when the mode of contracting is limited and provided for by statute, an implied contract cannot be raised.” (Kramrath v. City of Albany, 127 N. Y. 575, 581-582.)
Nor can it be urged that the county is estopped from asserting its rights by reason of an error of the former County Attorney in assuming the power to act for it. Any acts of such nature are not and cannot be binding on the municipality. 1 ‘ So, where a contract which could only be made by the common council was made by a waterworks committee, it is not ratified by mere failure of the council to take formal action repudiating the contract, notwithstanding individual members of the council had knowledge of the facts.” (10 McQuillin, Municipal Corporations, § 29.106, p. 528.)
Also, “ No estoppel can be effective, however, against a municipal corporation as to property which it holds for, and which is devoted to, public uses or purposes, since, as we have seen, such property is inalienable.” (10 McQuillin, Municipal Corporations, § 28.56, p. 199.)
*329 It may be a fact that the petitioners relied upon the housing policy statement that they would be permitted to remain in these housing facilities as long as they maintained their respective positions in the college. Such misplaced reliance cannot, however, constitute an equitable estoppel as urged by the petitioners. It has been so held universally in this and other jurisdictions. “ The grant here was completely beyond the power of the Town Board, without a ratification at a referendum. (Cf. Paul v. Seattle, 40 Wash. 294, 300.)
“ In City of Princeton v. Princeton Elec. Light & Power Co. (166 Ky. 730, 741) the court said: ‘ The persons who contract with municipal corporations must, at their peril, know the rights and powers of the officers of such municipalities to make contracts and the manner in which they must make them. Any other rule would destroy all the restrictions which are thrown around the people of municipalities for their protection by the statute laws and the constitution, and would render abortive all such provisions. The rule in certain instances may be harsh, but no other is practical. ’
“ Unfortunately, for defendants, such is the precise situation here. See, also, City of New York v. Wilson & Co. (278 N. Y. 86) wherein the court said at page 96: 1 Moreover, statements of city officials do not estop the city ’. (Cf., also, City of Geneva v. Cayuga Oil Co., 135 Misc. 673.) ” (Town of Guilderland v. Swanson, 41 Misc 2d 398, 400, affd. 29 A D 2d 717.) (Italics supplied.)
“ The city is not estopped from asserting its rights by these inconsistent acts, since the errors of law of city employees and officers are not binding upon the city. (New York City Employees’ Retirement System v. Eliot [267 N. Y. 193]; New York Tel. Co. v. Bd. of Education [270 N. Y. 111].) ” (City of New York v. Wilson & Co., 278 N. Y. 86, 99-100.) (Italics supplied.)
The case cited by petitioners’ counsel (Draper v. Oswego County Fire Relief Assn., 190 N. Y. 12) is clearly distinguishable. The Draper case does not involve a municipality, but rather a fire insurance company, nor does it involve a statutory delineation of power.
The argument that the collection of rent is in violation of the terms of the deed of conveyance to the county is a specious one.
The collection of rent in no way violates the provisions of the deed, since the housing facilities will still be used for college purposes and the payment of rent by the professors in no way changes the purpose for which the property is being used. That provision of the deed which states that any rental received by *330 the county shall he received and held in trust subject to the direction and control of the Department of Health, Education and Welfare, under the broadest interpretation, can in ho way affect the rights of the county, and whatever the intent of such provision, it cannot enure to the benefit of the petitioners herein. This is only a question as to whether the county or the Department of Health, Education and Welfare would be the beneficiary of the rent.
The proceedings herein are accordingly dismissed, and judgment is rendered in favor of the respondents. The stay hereinbefore granted is hereby vacated.